**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**Southern Division**

\*

**MARIA BRADY,**
\*

     **Plaintiff,**　　　　　　　　　　　**Case No.: GJH-15-2196**
\*

**v.**
\*

**BOARD OF EDUCATION OF PRINCE**
**GEORGE'S COUNTY,**

     **Defendant.**
\*

\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*

**MEMORANDUM OPINION**

    This is a lawsuit brought by a retired teacher, Maria Brady ("Plaintiff"), against her

former employer, Defendant Board of Education of Prince George's County ("Defendant" or

"the Board") for various violations under Section 504 of the Rehabilitation Act of 1973, 29

U.S.C. § 701 *et seq*. Brady claims that the Board, through the actions of its employees, failed to

accommodate her chronic spinal disorder; discriminated against her because of her disability by

creating a hostile workplace; retaliated against her for filing a grievance and eventually made her

workplace intolerable, compelling her to resign. Now pending before the Court is Defendant's

Motion for Summary Judgment. A hearing was held on November 18, 2016. *See* Loc. R. 105.6

(D. Md.). For the following reasons, Defendant's Motion for Summary Judgment is granted.

## I.　BACKGROUND

    Maria Brady was employed as a teacher by the Board of Education of Prince George's

County from 2002 until her retirement on November 1, 2014.[1] ECF No. 18-6 at 5.[2] Starting with

the 2008-09 school year and continuing through the 2014-15 school year, Brady worked at

---

[1] As this Opinion addresses Defendant's Motion for Summary Judgment, all facts herein are taken from the record as a whole, but viewed in the light most favorable to the Plaintiff.
[2] Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to page numbers generated by that system.

Kettering Middle School. *Id.* at 11-12. During the 2012-13 and 2013-14 school years she was supervised by the principal, Amin Salaam. ECF No. 1 at ¶ 23; *see also* ECF 18-2 at ¶ 5.[3]

Brady suffers from a chronic spinal disorder. ECF No. 19-1 ¶ 3. As a child, she was initially diagnosed with childhood scoliosis and later with a bulging disc in her back. *Id.* ¶ 1. In 2000, during her adult years, she was diagnosed with a degenerative disease of the neck and back as a result of an automobile accident. *Id.* Separately from these chronic issues, Brady had a minor altercation with a student on January 30, 2013, which led to an additional diagnosis of carpal tunnel syndrome. *Id.* ¶ 2.

Beginning in the middle of the 2012-13 school year, Brady began providing doctor's notes to Principal Salaam, regarding her diagnoses and the physical limitations they imposed on her. *Id.* ¶ 3. A doctor's note, dated January 23, 2013, recommended that Brady "limit long term standing" and a note dated February 4, 2013 said that "Maria Brady can no longer function in any capacity where risk of physical strain or injury is present" due to her treatment for a spinal disorder. ECF No. 19-2 at 3-4. Principal Salaam did not speak to her about a reasonable accommodation at that time, nor did he take alternative actions such as contacting the school's compliance officer concerning her need for a reasonable accommodation. ECF No.19-1 at ¶ 6.

According to Brady, her doctors told her that when she experienced back pain she should rest, but said that her pain could be managed without coming in for a doctor's appointment. *Id.* ¶ 9. However, when Brady requested sick leave on February 6, 2013, Principal Salaam said that she needed to supply a doctor's certificate upon her return to work. *Id.* ¶ 7; *see also* ECF No. 19-4 at 1. The requirement to provide documentation of doctor's visits forced her to take more time off from work than was necessary. ECF No. 19-1 ¶ 9.

---

[3] Neither side specifically states that Principal Salaam continued to supervise Brady during the 2014-15 school year. However, because Salaam continued to serve in the capacity of principal of Kettering Middle School during that time period, ECF No. 18-2 ¶ 3, the Court will assume that he was her supervisor during the 2014-15 school year.

The Negotiated Agreement between the Board of Education of Prince George's County and the Prince George's County Educators Association states that "a doctor's certificate of evidence for the necessity of loss of time shall be required for days in excess of three (3) for any one illness. A doctor's certificate may be required for periods of less than three (3) days absence, if in the opinion of either the immediate supervisor or the Chief Executive Officer's designee, the teacher is abusing sick leave privileges." ECF No. 18-7 at 20. Principal Salaam claims that the documentation requirements were reasonable because he believed Brady was abusing her sick leave.[4] ECF No. 18-2 ¶ 9. However, Brady asserts that there was no basis for this accusation since she had not exceeded her allowed days of annual sick leave in either the 2012 or 2013 calendar years. ECF No. 19-1 at ¶ 8.[5] Brady complained to school officials during a union meeting on January 13, 2014 regarding Principal Salaam's failure to grant her sick leave, but there was no follow up to her complaint. ECF No. 19-1 ¶ 16.

In addition to the requirement to provide documentation whenever she took sick leave, Principal Salaam increased Brady's workload during the 2013-14 school year, *id.* ¶ 11, and directed her to attend training at a distant location, *id.* ¶ 13. Principal Salaam also commented publicly that he did not believe Brady's injuries were real, saying "there is nothing wrong with your neck" on September 24, 2013 and November 3, 2013 and asking cynical questions about her neck brace on October 25, 2013. *Id.* ¶¶ 14-15. This led to students mocking her when she wore her medical apparatus to class, saying "Ms. Brady, Mr. Salaam said there's nothing wrong with you so why are you wearing that collar on your neck?" *Id.* ¶ 15.

---

[4] Specifically, Principal Salaam notes a correlation between Brady's submission of worker's compensation claims and student allegations that she acted aggressively towards them. ECF No. 18-2 ¶ 9 n.5; ECF No. 18-2 at 29.
[5] Brady states that she used six days of sick leave in the 2012 calendar year and five and a half days of sick leave in the 2013 calendar year. ECF No. 19-1 at ¶ 8. Her leave records indicate that she used slightly more sick leave than her affidavit would suggest, showing that she took six and a half days of sick leave in 2012 and eight days of sick leave in 2013. ECF No. 24-1 at 4-6. The Negotiated Agreement states that employees are entitled to ten days of sick leave a year, with employees accruing an additional day per year after eleven years of employment. ECF No. 18-7 at 19.

On July 22, 2014, Brady's doctor signed a statement saying that Brady "has been unable to return to work" from July 10, 2014 through January 15, 2015.[6] ECF No. 19-3 at 2. The statement references the January 2013 student altercation but also notes that Brady was suffering from chronic lower back pain and scoliosis not related to the incident. *Id.* at 1. The physician's note also states that Brady was disabled from March 6, 2014 through July 10, 2014. *Id.* On August 18, 2014, Brady informed her union that she would be out on Workman's Compensation related leave until January 5, 2015 and complained that Principal Salaam questioned her medical documentation, requesting more information than was required. ECF No. 18-2 at 34. On August 28, 2014, Brady submitted to an independent medical evaluation ordered by school officials regarding her request for extended leave. ECF No. 19-1 ¶ 23. The doctor concluded that her carpal tunnel was not caused by the January 30, 2013 student altercation and that her neck and hand symptoms that did relate to that injury had healed. ECF No. 18-2 at 49. The doctor also referenced her cervical issues and acknowledged that she had a multi-level degenerative disc disease. *Id.* at 48. However, his ultimate conclusion was that "[t]he patient can perform her regular and usual work activities as a teacher with no limitations." *Id.* at 50.

On August 18, 2014, Principal Salaam again informed Brady that she was required to present a doctor's certificate for any sick days, or they would be considered unpaid leave. ECF No. 19-1 ¶ 20. On August 19, 2014, Brady filed a grievance against Principal Salaam with her union, alleging that Principal Salaam did not require anyone else to present a doctor's certificate and that he falsely accused her of abusing sick leave. *Id.* ¶ 22. She also shared these allegations with various school board officials. *Id.* ¶ 21.

---

[6] Although phrased in the past-tense, given the dates, the Court assumes the doctor intended to reference future unavailability.

Brady returned to Kettering Middle School on September 15, 2014, and asserts that Principal Salaam continued to harass her in retaliation for filing a grievance with her union. ECF No. 19 at 7-10; *see also* ECF No. 19-1 ¶¶ 22, 25. For example, her schedule for the 2014-15 school year required her to teach between 28 and 32 classes per week, while other teachers only had to teach 15 to 20 classes per week. ECF No. 19-1 ¶ 25. In addition, Principal Salaam continued to accuse her of abusing her sick leave and requested documentation when she took sick leave on September 16, 2014. *Id.* ¶ 26. Principal Salaam also rejected the documentation she submitted for sick leave taken on October 3, 2014 and October 8, 2014. *Id.* ¶¶ 30, 32. In addition, Brady did not receive a paycheck on October 10, 2014, *id.* ¶ 32, and attempts to request meetings with school officials regarding Principal Salaam's behavior were rebuffed, *id.* ¶ 34.

School officials issued a Notice of Leave Request Denial to Brady on September 23, 2014, stating that, per the independent medical evaluation, her request for "FMLA/LOA"[7] had been denied and she had been cleared to return to work. ECF No. 18-2 at 51; *see also* ECF No. 18-5 at 3. On September 27, 2014, Brady submitted a formal, written request for a reasonable accommodation, including, among other suggestions, a request for extra staff in class to assist her. ECF No. 19-1 at ¶¶ 28, 29; *see also* ECF No. 18-2 at 67. On October 16, 2014, Brady was assigned a co-teaching position by Kettering Middle School's Assistant Principal. ECF No. 19-1 at ¶ 36; *see also* ECF No. 18-2 at 71. However, Brady states in her affidavit that her workload was not reduced and she continued to perform lead teacher duties. ECF No. 19-1 at ¶ 36. Brady met with Amana Simmons Esq., Prince George's County Public Schools EEO Advisor, and the meeting was memorialized in an October 22, 2014 email in which Simmons states:

Ms. Brady,

---

[7] The record does not indicate exactly what "FMLA" and "LOA" signify, but based on context, the Court believes that they likely refer to the Family Medical Leave Act ("FMLA") and a Leave of Absence ("LOA").

It was a pleasure meeting with you this afternoon respecting your pending 4172 Request for Accommodations. During that meeting, you advised that you recently received a new schedule as a co-teacher and that you did not feel that you presently required any accommodations. You advised that you had only been working intermittently, but that you would allow time to work under the new schedule. Accordingly, at your request, I will not take any further action respecting your 4172 Request for Accommodation.

Best regards,

ECF No. 18-2 at 73. Brady responded by saying "Thank you for your understanding." *Id.*

Brady's doctors advised her that stress at work was causing her additional back pain, leading her

to again take sick leave in or around October 22, 2014. ECF No. 19-1 at ¶ 37. On October 22,

2014, Brady was told that Principal Salaam had placed her on leave without pay and that she

would not receive any more paychecks. *Id.* ¶ 38. Because she was not receiving paychecks and

feared that she would soon be terminated, and would thus lose retirement benefits, Brady applied

for early retirement on October 25, 2014, to be effective November 1, 2014. *Id.* at ¶¶ 38, 41.

Brady states that she made a final attempt during this period to request meetings with school

officials to discuss the situation, but the requested meetings never occurred. *Id.* ¶¶ 39-40.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate if "materials in the record, including depositions,

documents, electronically stored information, affidavits or declarations, stipulations . . . ,

admissions, interrogatory answers, or other materials," Fed. R. Civ. P. 56(c), show that there is

"no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The

party moving for summary judgment bears the burden of demonstrating that no genuine dispute

exists as to material facts. *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir.

1987). If the moving party demonstrates that there is no evidence to support the non-moving

party's case, the burden shifts to the non-moving party to identify specific facts showing that

there is a genuine issue for trial. *See Celotex*, 477 U.S. at 322–23. A material fact is one that

"might affect the outcome of the suit under the governing law." *Spriggs v. Diamond Auto Glass*,

242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986)). A dispute of material fact is only "genuine" if sufficient evidence favoring the non-

moving party exists for the trier of fact to return a verdict for that party. *Anderson*, 477 U.S. at

248. However, the nonmoving party "cannot create a genuine issue of material fact through mere

speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214

(4th Cir. 1986).

The Court may only rely on facts supported in the record, not simply assertions in the

pleadings, in order to fulfill its "affirmative obligation . . . to prevent 'factually unsupported

claims or defenses' from proceeding to trial." *Felty v. Grave-Humphreys Co.*, 818 F.2d 1126,

1128 (4th Cir. 1987) (quoting *Celotex*, 477 U.S. at 324–25). When ruling on a motion for

summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable

inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

## III.   DISCUSSION

Plaintiff brings all four of her claims under Section 504 of the 1973 Rehabilitation Act,

29 U.S.C. § 794. The Rehabilitation Act provides, in relevant part, that "[n]o otherwise qualified

individual with a disability in the United States….shall, solely by reason of her or his disability,

be excluded from the participation in, be denied the benefits of, or be subjected to discrimination

under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

"[P]rogram or activity" is defined as "all of the operations of ... a department, agency…or other

7

instrumentality of a State or of a local government," and thus encompasses public school boards of education such as the Defendant. 29 U.S.C. § 794(b)(1)(A).

Plaintiff's Complaint raises four distinct causes of actions under the Rehabilitation Act: (1) failure to accommodate; (2) hostile workplace; (3) retaliation; and (4) constructive discharge. The Court will consider each in turn.

## A. Count I: Failure to Accommodate Disability

To establish a *prima facie* case of failure-to-accommodate under the Rehabilitation Act, Plaintiff must show that "(1) she qualifies as an 'individual with a disability' as defined in 29 U.S.C.A. § 705(20); (2) the [Defendant] had notice of her disability; (3) she could perform the essential functions of her job with a reasonable accommodation; and (4) the [Defendant] refused to make any reasonable accommodation." *See Reyazuddin v. Montgomery Cty., Maryland,* 789 F.3d 407, 414 (4th Cir. 2015). "Employment discrimination claims brought under Section 504 are evaluated using the same standards as those 'applied under [T]itle I of the Americans with Disabilities Act of 1990.'" *Id.* at 413 (internal citation omitted).

In support of the first element of her claim, Brady argues that her chronic spinal disorder substantially limited her major life activities. ECF No. 19-1; *see also* ECF No. 18-2 at 68. Defendant does not address whether or not a chronic spinal disorder could theoretically constitute a disability, instead arguing that Brady specifically was not substantially limited in any major life activities because she was medically cleared to return to work without restriction as part of an independent medical evaluation on August 28, 2014. ECF No. 18-1 at 14; *see also* ECF No. 18-2 at 44.

The Rehabilitation Act adopts the ADA's definition of disability for claims under §794, *see* 29 U.S.C § 705(9)(B), and has been amended to incorporate the definition in the ADA

Amendments Act of 2008 ("ADAAA"). *See Harrison-Khatana v. Washington Metro. Area Transit Auth.*, No. CIV.A. DKC 11-3715, 2015 WL 302820, at *7 (D. Md. Jan. 22, 2015). Under the ADAAA, disability is defined as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual, (B) a record of such an impairment or (C) being regarded as having such an impairment…" 42 U.S.C. § 12102(1). Pursuant to the statute, "[m]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." *Id.* at § 12102(2)(A).

To prove that her chronic spinal disorder substantially limits one or more major life activities, Brady submitted a doctor's note from January 23, 2013 noting that she should "limit long term standing" and that "[patient's] tolerance to pain will be limit on hours and after school activities." ECF No. 19-2 at 3. Similarly, she submitted a doctor's note from July 22, 2014 which notes diagnoses of cervical disc disorder, chronic lower back pain and scoliosis. ECF No. 19-3. In that note, the doctor further stated that Brady was unable to write, bend, lift or sit for long periods and that she would be unable to return to work from July 10, 2014 through January 15, 2015. *Id.* Regulations implementing the ADAAA advise broad construction of the 'substantially limits' phrasing in the statute, noting that "[t]he primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment substantially limits a major life activity." 29 C.F.R. § 1630.2(j)(1)(iii). In that vein, the Fourth Circuit has stated that "the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis." *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 572 (4th

Cir. 2015). Therefore, the Court finds that the doctor's notes submitted by Brady provide sufficient evidence that a reasonable jury could conclude that Brady was disabled.

Defendant's reliance on the fact that Brady was medically cleared to return to work does not alter the Court's conclusion. *Harrison-Khatana v. Washington Metro. Area Transit Auth.,* No. CIV.A. DKC 11-3715, 2015 WL 302820 (D. Md. Jan. 22, 2015), is instructive on this point. There, as here, the defendant claimed that the plaintiff was not disabled because a doctor determined that she was able to return to work after a worker's compensation injury. *Id.* at *11. Judge Chasanow held that such a decision "does not invalidate Plaintiff's claim that she had a disability for which she needed a reasonable accommodation to perform her job." *Id* at *13. (holding that Plaintiff had established a genuine dispute regarding whether or not her knee and back impairments substantially limited a major activity). Similarly, here, Brady has established a genuine dispute regarding the first element of her claim.[8]

The crux of Plaintiff's claim rests on her ability to prove the third and fourth elements of the *prima facie* case; that she could perform the essential functions of her job with a reasonable accommodation and that the Defendant refused to make such an accommodation. The third element of the failure-to-accommodate analysis consists of two prongs: whether the specific accommodation requested was reasonable and whether the plaintiff could perform the essential functions of the position if the requested accommodation was provided. *Jacobs v. N.C. Admin. Office of the Cts.,* 780 F.3d 562, 580 (4th Cir. 2015). "A reasonable accommodation is one that 'enables [a qualified] individual with a disability ... to perform the essential functions of [a] position.'" *Id.* (quoting 29 C.F.R. § 1630.2(o)(1)(ii)). Reasonable accommodations may comprise "job restructuring, [or] part-time or modified work schedules." 42 U.S.C. §

---

[8] Viewing the evidence in the light most favorable to Plaintiff, the Court finds that Defendants had notice of the disability as of January 2013 when Plaintiff began submitting notes from her doctor, thus providing sufficient evidence for  the second element of her claim.

12111(9)(B). However, the Board still avoids liability if it "establishes as a matter of law that the proposed accommodation will cause 'undue hardship in the particular circumstances.'" *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 464 (4th Cir.2012)(quoting *U. S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401–02 (2002)). "Courts have reconciled and kept distinct the 'reasonable accommodation' and 'undue hardship' requirements by holding that, at the summary judgment stage, the employee 'need only show that an accommodation seems reasonable on its face,' and then the employer 'must show special (typically case-specific) circumstances that demonstrate undue hardship.'" *Reyazuddin*, 789 F.3d at 414(quoting *Barnett*, 535 U.S. at 401–02 (2002)).

Regarding the fourth element, "[t]he ADA imposes upon employers a good-faith duty to engage [with their employees] in an interactive process to identify a reasonable accommodation." *Jacobs*, 780 F.3d at 581. "However, an employer will not be liable for failure to engage in the interactive process if the employee ultimately fails to demonstrate the existence of a reasonable accommodation that would allow her to perform the essential functions of the position." *Id.* As the third and fourth elements overlap, the Court will address them jointly.

Reviewing Plaintiff's submissions, the Court identified three moments in which Plaintiff arguably made a request for a reasonable accommodation; (1) January 23, 2013: when Plaintiff began submitting doctor's notes to Principal Salaam regarding her condition ("2013 leave request"), (2) September 27, 2014: when Plaintiff submitted a formal request for a reasonable accommodation, suggesting several accommodations including a co-teaching position, ("formal request") and (3) Plaintiff's requests for additional leave in the fall of 2014 ("2014 leave request").

1.    2013 Leave Request

In her 2013 leave request, Plaintiff sought to use her accrued sick leave to take time off from work when her chronic spine condition caused her pain. A request for leave, on its face, is not an unreasonable accommodation. *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 345 (4th Cir. 2013). Moreover, while Principal Salaam alleges that Plaintiff was abusing her sick leave during this time period, Defendant does not appear to claim that Plaintiff's requests for leave during the spring of 2013 were so frequent that she was unable to perform the essential functions of her job. A review of Plaintiff's leave records during this time period show that she took five and a half days of sick leave after submitting her doctor's notes. ECF No. 24 at 5-6. Thus, the Court finds that during the spring of the 2013 school year, Plaintiff's requests to use her sick leave were reasonable and that by providing that accommodation, she could perform the essential functions of her job.

However, Plaintiff claims that Defendant failed to accommodate her request by imposing a requirement that she submit documentation in the form of a doctor's note whenever she used her sick leave. In support of this claim, she argues that per the negotiated agreement between the school system and the teacher's union, she only had to provide documentation if she was requesting more than three days off in a row. But a request for a reasonable accommodation is not a one-way street, with the employer automatically ceding to all of the employee's requests; "[a]n employer may reasonably accommodate an employee without providing the exact accommodation that the employee requested." *Reyazuddin*, 789 F.3d at 415. Plaintiff has submitted no evidence that the Defendant failed to allow her to take her sick leave during this time period, only that Principal Salaam requested additional documentation to support the

requests. In short, she requested leave and it was granted. Thus, Plaintiff does not have a viable failure to accommodate claim as it relates to this request.

2.    Formal Request

Any claim related to a failure to accommodate Plaintiff's formal September 27, 2014 accommodation request fails because, as Plaintiff conceded during oral argument, Defendant properly responded to it. Upon receiving Plaintiff's formal request, Defendant engaged Plaintiff in precisely the sort of interactive process contemplated by the ADA. *Allen v. City of Raleigh*, 140 F. Supp. 3d 470, 483 (quoting 29 C.F.R. § 1630.2(o)(3) ("The ADA contemplates an open, interactive process between the employer and employee to 'identify the precise limitations resulting from the disability and the potential reasonable accommodations that could overcome the limitations.'")) The parties agree that at the conclusion of the process, Plaintiff was given the co-teaching position she was requesting but Plaintiff states in her affidavit that her work-load was not reduced. But any suggestion that she was not satisfied at the end of the meeting is directly refuted by the email exchange between Plaintiff and Amana Simmons Esq., Prince George's County Public Schools EEO Advisor, where Brady responded "[t]hank you for your understanding" to an email wherein Simmons confirms that Brady (1) told her she had received a new co-teaching schedule and (2) did not presently require additional accommodation. ECF No. 18-2 at 73. Within a week of this exchange, Plaintiff retired.

3.    2014 Leave Requests

Finally, Plaintiff again made requests for sick leave in the beginning of the 2014-15 school year, which the Court will construe as an additional request for a reasonable accommodation. Defendant argues that an essential function of a teacher's job is attendance, and that as her absences increased, Plaintiff ceased to be a "qualified individual" because there was

13

no reasonable accommodation that could be provided that would allow Plaintiff to perform the essential functions of the position. *Tyndall v. Nat'l Educ. Centers, Inc. of California*, 31 F.3d 209, 213-14 (4th Cir. 1994), is instructive on this point. There, the court held that despite the fact that a teacher had the necessary skills to perform well when she was at work her "frequent absences rendered her unable to function effectively as a teacher." Moreover, the school's extensive accommodations did not improve her attendance level. *Id.* While Brady's absences are not as extreme as those in *Tyndall*, her school was ultimately forced into the same situation. While her leave requests had been accommodated during the 2012-13 and 2013-14 school years, in the time proceeding the 2014-15 school year she requested four months of workers compensation based leave, was denied when a doctor deemed her fit to work, and then requested over two weeks of leave from September 16, 2014 to October 3, 2014. While, "a leave request will not be unreasonable on its face," such a request must "(1) [be] for a limited, finite period of time; (2) consist[] of accrued paid leave or unpaid leave; and (3) [] shown to be likely to achieve a level of success that will enable the individual to perform the essential functions of the job in question." *Wilson*, 717 F.3d at 345 n.7 (citing *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454 at 465–66 (4th Cir. 2012); *Myers v. Hose*, 50 F.3d 278, 283 (4th Cir. 1995)).

Here, the initial leave requests that the school granted merely resulted in an increasing number of additional leave requests, with Brady's use of five and a half sick days in the spring of 2013 increasing to missing entire weeks of work in the 2014-15 school year. Thus, as in *Wilson*, "[Plaintiff] has not identified a possible reasonable accommodation, other than leave, that would have enabled [her]to perform the essential functions of [her] position; nor has [Plaintiff] produced evidence that had [she] been granted such leave, [she] could have performed the essential functions of [her] position on [her] requested return date." *Id.* at 346. Thus, Defendant's

Motion for Summary Judgment is granted with regards to Plaintiff's failure to accommodate claim.

### B. Count II: Hostile Workplace

Plaintiff's second claim alleges "disability harassment" in the workplace, ECF No. 1 at 3, which the Court will interpret as a hostile workplace claim. "In order to establish a hostile work environment claim [under the Rehabilitation Act], a claimant must demonstrate that the alleged conduct: 1) was unwelcome; 2) resulted because of her…disability…; 3) was 'sufficiently severe or pervasive' to alter the conditions of her employment; and 4) was imputable to her employer." *Pueschel v. Peters*, 577 F.3d 558, 564–65 (4th Cir. 2009)(citation omitted). As with her failure to accommodate claim, Plaintiff's hostile workplace claim is evaluated under the same standards as a hostile workplace claim under Title I of the ADA. *Reyazuddin*, 789 F.3d at 413 ( "Employment discrimination claims brought under Section 504 are evaluated using the same standards as those applied under [T]itle I of the Americans with Disabilities Act of 1990."). Similarly, because "the ADA's cause of action for hostile work environment is modeled after the Title VII [of the Civil Rights Act of 1964] cause of action," *Sumner v. Mary Washington Healthcare Physicians*, No. 3:15CV42, 2016 WL 5852856, at *8 n9 (E.D. Va. Sept. 30, 2016)(citation omitted), the Court will rely on case law interpreting ADA and Title VII cases in evaluating Plaintiff's case.

Plaintiff alleges that the following conduct created a hostile workplace: (1) Principal Salaam's requirement to provide a doctor's note whenever Plaintiff used her sick leave; (2) an increased workload in the 2013-14 and 2014-15 school years; (3) the requirement to attend training at a distant location; (4) public comments by Principal Salaam mocking her disability (i.e. "there is nothing wrong with your neck") and questions regarding her neck brace; (5) comments by students regarding her neck brace; (6) rejection of doctor's notes when she took

sick leave in October 2014; (7) failure to hold several meetings requested by Plaintiff to discuss Principal Salaam's conduct; (8) failure to receive a paycheck; (9) failure to reduce workload even after assignment to co-teaching position, forcing Plaintiff to continue to work as a lead teacher and (10) placement on leave without pay status. ECF No. 19 at 19-21; *see also* ECF No. 19-1 at ¶¶ 9-17, 28-33.

As with many hostile workplace cases, the success of Plaintiff's claim turns on her ability to establish the third element of her *prima facie* case; that is - can she show that the discrimination was sufficiently severe or pervasive to alter the conditions of employment? *E.E.O.C. v. Cent. Wholesalers, Inc.*, 573 F.3d 167, 175 (4th Cir. 2009). On the facts that Plaintiff has put before the Court, she cannot. "[The third] element of a hostile work environment claim has both subjective and objective components. Therefore, the [Plaintiff] must show that [she] did perceive, and a reasonable person would perceive, the environment to be abusive or hostile." *Id.* (internal citation omitted). Plaintiff establishes via her affidavit and her complaints to school officials that she found the above referenced conduct to be subjectively abusive. ECF No. 19-1. In order to show that a reasonable person would share this perception, the Court considers "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Wilson v. City of Gaithersburg*, 121 F. Supp. 3d 478, 483–84 (D. Md. 2015)(quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23 (1993)).

The Fourth Circuit has repeatedly noted that plaintiffs must "clear a high bar" in order to satisfy this test, holding that complaints premised on "rude treatment" or "callous behavior" are not actionable. *E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 316 (4th Cir. 2008)(internal citation omitted). In doing so, the Fourth Circuit observed that "[w]orkplaces are not always

harmonious locales," concluding that "even incidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe or pervasive standard." *Id.* The Fourth Circuit recently clarified however that, if severe enough, even isolated incidents of harassment can constitute a hostile workplace claim. *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 280 (4th Cir. 2015)(holding that supervisor's "odious" use of a racial slur created a hostile workplace).

Viewing the evidence in the light most favorable to the Plaintiff, it is clear that working with Principal Salaam was not a pleasant experience. But she has not produced evidence that her work environment was "pervaded with discriminatory conduct 'aimed to humiliate, ridicule, or intimidate.'" *E.E.O.C. v. Cent. Wholesalers, Inc.*, 573 F.3d 167, 176 (4th Cir. 2009)(internal citation omitted). Here, Salaam's actions were not so severe and pervasive as to alter her conditions of employment. Many of Plaintiff's claims centered around her interactions with Principal Salaam regarding her ability to take leave and are more accurately described as disagreements with the personnel decisions of her supervisor. Disagreement with the decisions or management style of one's boss, while perhaps not uncommon, do not rise to the level of a hostile workplace claim. *Thorn v. Sebelius*, 766 F. Supp. 2d 585, 601 (D. Md. 2011), *aff'd*, 465 F. App'x 274 (4th Cir. 2012)(holding that allegations of harassment including denial of transfer requests and removal from certain duties failed to establish a claim of retaliatory hostile work environment, and instead "amount[ed] to instances where [plaintiff] disagreed with the management style or decisions of those who supervised him—and that alone is not actionable under Title VII.").

Similarly, Brady's second category of claimed hostile behavior, relating to increased workloads in the 2013-14 and 2014-15 school years, the requirement to attend training at a

distant location and failure to decrease workload after assigning her to a co-teaching position are "ordinary personnel decisions," again outside the scope of the type of severe and pervasive conduct that the Fourth Circuit has said would alter a person's conditions of employment. *See Hemphill v. ARAMARK Corp.*, No. 1:12-CV-01584-ELH, 2014 WL 1248296, at \*14 (D. Md. Mar. 25, 2014), *aff'd,* 582 F. App'x 151 (4th Cir. 2014)(finding the assignment of additional work and placement on a performance improvement plan insufficient to state a claim for hostile workplace). Finally, a total of three specific comments by Principal Salaam questioning her disability (i.e. "there is nothing wrong with your neck") along with a vague reference to additional remarks, while discourteous, are similarly insufficient to state a claim. Although publicly mocking an employee is surely not the example one would expect in our public schools, especially as it led to the students then mocking the teacher,[9] such comments are closer to "a mere offensive utterance," *Harris*, 510 U.S. at 23, than the "odious comment" that the Court found in *Boyer-Liberto. Boyer-Liberto,*786 F.3d at 280. *See also Beshir v. Jewell*, 961 F. Supp. 2d 114, 128 (D.D.C. 2013)(holding that allegation of being yelled at on a daily to weekly basis, often in front of colleagues, and subject to threats of thwarting career advancement was not sufficient to constitute a hostile workplace claim). Therefore, the Court finds that Brady has failed to demonstrate a *prima facie* case of hostile workplace environment. Thus, the Court grants Defendant's Motion for Summary Judgment in regards to Plaintiff's hostile workplace claim.

---

[9] Brady notes that "students in the past have come to me laughing when I wear medical apparatus, stating, "Ms. Brady, Mr. Salaam said there's nothing wrong with you so why are you wearing that collar on your neck?" ECF 19-1 at ¶ 15. While she does not state how often these incidents occur, this conduct falls into the category of "simple teasing, offhand comments, and isolated incidents" that do not amount to discriminatory changes in the terms and conditions of employment. *E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008).

**C. Count III: Retaliation**

Turning next to Plaintiff's retaliation claim, Brady must establish her *prima facie* case by showing "(1) that [s]he engaged in protected activity, (2) that the Board took an adverse action against [her], and (3) that the adverse action was causally connected to [her] protected activity." *S.B. ex rel. A.L. v. Bd. of Educ. of Harford Cty.*, 819 F.3d 69, 78 (4th Cir. 2016)(internal citations and quotations omitted). Under the burden shifting framework of *McDonnell Douglas*, if Brady meets this burden, "then the Board must articulate a legitimate non-retaliatory reason for its actions, at which point the burden shifts back to [Plaintiff] to demonstrate that the proffered reason is a pretext for forbidden retaliation." *Id.*(citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). The Rehabilitation Act incorporates the ADA's anti-retaliation provision, which in turn is substantially identical to Title VII's anti-retaliation provisions. *Hooven–Lewis v. Caldera*, 249 F.3d 259, 272 (4th Cir.2001) (recognizing that the Rehabilitation Act incorporates the ADA's anti-retaliation provision); *Haines v. Donahoe*, No. CIV.A. ELH-10-293, 2012 WL 3595965, at *10 (D. Md. Aug. 20, 2012), *aff'd,* 538 F. App'x 329 (4th Cir. 2013)(comparing anti-retaliation provisions of Rehabilitation Act, ADA and Title VII). Thus, as with Plaintiff's other claims, the Court will look to case law developed under all three statutes to interpret Plaintiff's claim.

"Opposition activities include not only filing a formal discrimination complaint, but also 'utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities.'" *Booth v. Cty. Exec.*, No. CV TDC-15-2231, 2016 WL 2757367, at *5 (D. Md. May 11, 2016)(quoting *Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 259 (4th Cir.1998)). Plaintiff alleges, and Defendant does not dispute, that she engaged in protected activity by filing a

grievance against Principal Salaam with her union on August 19, 2014. Thus, she has established the first element of her case.

Turning to the second element, Plaintiff alleges that she was subjected to the following adverse actions after filing her grievance: (1) she was assigned increased teaching assignments for the 2014-15 school year; (2) Principal Salaam rejected doctors notes that she submitted when she took sick leave in early October 2014; (3) school officials failed to hold several meetings requested by Plaintiff to discuss Principal Salaam's conduct and (4) she failed to receive a paycheck on October 10, 2014 after being placed on leave without pay status. ECF No. 19-1 ¶¶ 25, 30, 32-33, 35. Even assuming that these actions "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006), Plaintiff's claims still fail for lack of but-for causation.

Plaintiff must establish a causal connection between the adverse action and the protected activity. The Fourth Circuit recently stated in the context of an ADA discrimination case, that a Plaintiff must prove "but-for" causation. *Gentry v. E. W. Partners Club Mgmt. Co. Inc.*, 816 F.3d 228, 235–36 (4th Cir. 2016)("The only remaining question is whether the ADA's text calls for a 'but-for' causation standard. We hold that it does."); *see also Staley v. Gruenberg*, 575 F. App'x 153, 156 (4th Cir. 2014)(applying but-for causation in retaliation case under ADA, Rehabilitation Act and Title VII); *see also Palmquist v. Shinseki*, 689 F.3d 66, 74 (1st Cir. 2012)(adopting but-for causation for Rehabilitation Act claims).

Plaintiff claims that the temporal proximity, one month, between the filing of a grievance and the beginning of the adverse actions is enough to establish causation. In the alternative, she argues that if the Court does not find causation based on temporal proximity, it could find it based on recurring retaliatory animus. To begin with, "[t]emporal proximity *alone* is insufficient

to establish the third element of causation." *Smith v. Strayer Univ. Corp.*, 79 F. Supp. 3d 591, 605 (E.D. Va. 2015)(citing *Staley v. Gruenberg,* 575 Fed. Appx. 153, 156 (4th Cir.2014)). More importantly, however, the record shows that much of the behavior that Plaintiff complains of actually pre-dates the protected activity. For example, in her affidavit she also states that she was given an increased workload during the 2013-14 school year before she filed her grievance. ECF No. 19-1 ¶ 11. Similarly, her complaints that school officials did not wish to meet to discuss her complaints about Principal Salaam stretch back to at least January 13, 2014. *See* ECF No. 19-1 ¶ 16. Finally, Brady submits no evidence to link her two most serious allegations of adverse action, rejection of doctor's notes and failure to receive a paycheck due to her placement on absence without leave status, to her protected action. In contrast, the evidence demonstrates that Brady's doctors notes were rejected once an independent doctor cleared her for work and her leave requests increased. This, in turn, led to her being in leave without pay status. Thus, because a reasonable jury could not conclude that, but for her filing a grievance, the school would not have taken adverse action against her, the Court will grant Defendant's Motion for Summary Judgment as to the Plaintiff's retaliation claim.

### D.  Count IV: Constructive Discharge

Brady's fourth and final claim alleges that she was constructively discharged from her job as a form of intentional discrimination against her because of her disability. "A constructive discharge occurs when 'an employer deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job.'" *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir. 1985)(citing *Holsey v. Armour & Co.*, 743 F.2d 199, 209 (4th Cir. 1984). "A plaintiff alleging constructive discharge must therefore prove two elements: deliberateness of the employer's action, and intolerability of the working conditions." *Id.*

In support of her claim of constructive discharge, Plaintiff states that (1) she was placed on leave without pay by Principal Salaam on October 10, 2014 and on October 22, 2014 was told she would not receive any more paychecks; (2) she requested meetings with school administrators but they refused to meet with her; and (3) she was concerned that she would be terminated and would lose her medical benefits and life insurance.  ECF No. 19-1 ¶¶ 35, 38-41.

"Deliberateness can be demonstrated by actual evidence of intent by the employer to drive the employee from the job, or circumstantial evidence of such intent, including a series of actions that single out a plaintiff for differential treatment." *Johnson v. Shalala*, 991 F.2d 126, 131 (4th Cir. 1993)(internal citation omitted); *see also Dones v. Donahoe*, 987 F. Supp. 2d 659, 668 (D. Md. 2013). Defendant correctly points out that the fact that the school assigned Brady a co-teaching position on October 16, 2014, as per her request for a reasonable accommodation, demonstrates an intent to allow Brady to work rather than to drive her from the school. Furthermore, to the extent that Brady was displeased with the accommodation, a partial or imperfect attempt to accommodate an employee does not give rise to constructive discharge. *Johnson v. Shalala*, 991 F.2d 126, 132 (4th Cir. 1993). Thus, Plaintiff fails to establish the first element of her constructive discharge claim.

Plaintiff's allegation that the workplace was objectively intolerable is similarly without support in the record. With the exception of her concern that she feared that she would be terminated, these are the same facts the Court analyzed in denying her hostile workplace claim. It logically follows that the same facts that were insufficient to establish an objectively abusive and hostile workplace would be unable to establish an objectively intolerable workplace. "'Intolerability' is not established by showing merely that a reasonable person, confronted with the same choices as the employee, would have viewed resignation as the wisest or best decision,

or even that the employee subjectively felt compelled to resign; presumably every resignation occurs because the employee believes that it is in his best interest to resign. Rather '[i]ntolerability ... is assessed by the objective standard of whether a 'reasonable person' in the employee's position would have felt *compelled* to resign,'--that is, whether he would have had *no choice* but to resign." *Dones v. Donahoe*, 987 F. Supp. 2d at 668)(quoting *Blistein v. St. John's Coll.,* 74 F.3d 1459, 1468 (4th Cir.1996)(overruled on other grounds)(emphasis in original). The conditions alleged here are no more severe than conditions that the Fourth Circuit has previously deemed tolerable. *See Williams v. Giant Food Inc.,* 370 F.3d 423, 434 (4th Cir.2004) (finding that the plaintiff was not constructively discharged where she alleged that her supervisors yelled at her, told her she was a poor manager, gave her poor evaluations, chastised her in front of customers, and required her to work with an injured back because, even if the plaintiff's allegations were true, these actions were not objectively intolerable).

Because a reasonable jury could not conclude that Principal Salaam deliberately made her working conditions intolerable in an effort to induce her to quit, the Court will grant Defendant's Motion for Summary Judgment with regards to this claim.

## IV.   CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment, ECF No. 18, is granted. A separate Order follows.

Dated: December 7, 2016

GEORGE J. HAZEL
United States District Judge